**BADOVICK, Appellee,**

v.

**BADOVICK, Appellant.**

[Cite as *Badovick v. Badovick* (1998), 128 Ohio App.3d 18.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 72317.

Decided May 26, 1998.

20

*Joyce E. Barrett,* for appellee.

*Loretta A. Coyne* and *Charles H. Bragg,* for appellant.

PATTON, Judge.

The domestic relations court granted plaintiff-wife Kimberly Badovick and defendant-husband Gregory Badovick a divorce. The primary issues in this appeal from that judgment concern the amount of income imputed to husband for purposes of determining child support and the division of marital property.

The parties divorced after a seven-year marriage. At the time of divorce, they had a four-year-old child. During the marriage, they had a combined income of slightly more than $100,000. However, in January 1995, husband lost his job when his employer went bankrupt, and he remained unemployed throughout the divorce proceedings. The court imputed to him income of $80,000, a figure equal to his income for the last year that he remained employed. With that determination, the court ordered husband to pay $712.47 per month in child support. The court made wife the custodial parent and primary caretaker of the child and granted husband visitation privileges. It also ordered husband to take out a

$100,000 life insurance policy "naming [wife] as irrevocable beneficiary during the child's minority."

I

The first and second assignments of error relate to the court's decision to impute to husband income of $80,000 for purposes of figuring child support. Husband maintains that this figure is unreasonable in light of his inability to find comparable work. He maintains that the court failed to consider prevailing job opportunities within the community in arriving at the $80,000 imputed income level.

In cases where the court is asked to impute income, it must follow a two-step process. First, the lower court must find that a party is voluntarily unemployed or underemployed before it can impute any income to that party. Second, once a party is found to be voluntarily unemployed or underemployed, the potential income to be imputed to that party must be determined in accordance with the considerations listed in R.C. 3113.215(A)(5)(a). *Leonard v. Erwin* (1996), 111 Ohio App.3d 413, 417, 676 N.E.2d 552; *Madden v. Madden* (Oct. 30, 1997), Cuyahoga App. No. 71302, unreported, 1997 WL 675449. Before computing child support, the court must determine the income levels of the respective parents. If a parent is underemployed or unemployed, the court must consider "potential income," that is, income that the parent would have earned if he or she had been "fully employed." R .C. 3113.215(A)(5)(a). That amount is to be determined by (1) the parent's employment potential and probable earnings based on the parent's recent work history, (2) job qualifications, and (3) the prevailing job opportunities and salary levels in the community in which the parent resides. *Rock v. Cabral* (1993), 67 Ohio St.3d 108, 616 N.E.2d 218, syllabus. Whether a parent is "voluntarily underemployed" within the meaning of R.C. 3113.215(A)(5), and the amount of "potential income" to be imputed to a child support obligor, are matters to be determined by the trial court based upon the facts and circumstances of each case. The determination will not be disturbed on appeal absent an abuse of discretion. *Id.*, 67 Ohio St.3d at 110, 616 N.E.2d at 220–221; *Marsh v. Marsh* (1995), 105 Ohio App.3d 747, 750, 664 N.E.2d 1353, 1354–1355. We have held that the factors set forth in *Rock* are mandatory—the court's failure to consider all three factors will constitute an abuse of discretion. See *Dixon v. Dixon* (March 9, 1995), Cuyahoga App. No. 66997, unreported, at 2, 1995 WL 106137.

The court abused its discretion by ordering child support based on income imputed to husband. That portion of the court's judgment entry relating to support stated in its entirety:

"The Court further finds that Plaintiff's taxable wages for 1996 were in excess of $47,000.00 and Defendant's last earnings were received in 1994 in an amount in excess of $80,000.000 and that said Defendant has not been employed since said date. The Court, however, for purposes of calculating child support will impute to the Defendant the latter amount."

This order did not consider husband's employment potential and probable earnings based on his recent work history, his job qualifications, and the prevailing job opportunities and salary levels in the Cleveland metropolitan area.

█ We find that the court also abused its discretion by imputing to husband $80,000 as income. The evidence tended to show that husband actively sought employment, sending out fifty or sixty resumes and utilizing the services of job headhunters, but could not find comparable work at his income level. He testified that he would have accepted a lesser salary, but employers were reluctant to hire him because they feared he would leave as soon as a more lucrative position became available elsewhere. Referring to one specific employer who told husband that it would not hire him for $50,000 per year only to have him leave after one year for a better-paying job, the court asked husband whether he would have been willing to tell them that he would sign an employment contract stating, "you won't go to work for any other company as long as they will hire you for ten years?" Husband resisted that idea, saying he would not want to "lock myself up for ten years." The court then concluded, "So, you are admitting you blew a good opportunity?"

In light of husband's difficulties finding comparable work, the court appeared to concede that husband could not expect to earn the same salary he previously earned:

"According to your testimony there doesn't seem to be any jobs—I am wondering what you could do to support yourself and your child. That's all. People do all kind of things that they don't like to do. I would say 90 percent of all the people at work today don't enjoy or do what they are doing, but they do it out of necessity. Very few of us get to do what they like to do or even are trained to do. That's how our society works. It's a matter of meeting the necessity of existence. I am questioning what you could do other than wait for a miracle to happen for somebody to hire you for $80,000 a year."

The court's remark that husband would have to "wait for a miracle" to happen before he might find a comparable salary indicated that the court knew that it would be highly unlikely for husband to earn $80,000 in a year. Despite this, the court mistakenly believed that it had no choice but to impute $80,000 in income to husband:

"I have to charge you with $80,000 a year. * * * That's what I have to charge you with. You claim you are worth that. You are capable of doing that, the law says if that's the fact, then we have to say that that's what you should be earning, and we have to charge you with that, and I don't like the idea of imputation, but that seems to be what the law implies."

We do not say that the court erred by imputing income to husband in the first instance. Pursuant to R.C. 3113.215(A)(5)(a), the court properly decided to impute income to husband and husband's two-year job search could not excuse his duty to support his child. Nevertheless, factors set forth in R.C. 3113.215(A)(5)(a) instruct the court to impute income based upon "the prevailing job opportunities and salary levels in the community in which the parent resides." By the court's own reckoning, husband could not realistically expect to earn $80,000 in the community—the offers he received were for significantly less money.

Wife argues that the court could reasonably impute husband's income based solely on the amount he last earned while employed. We reject this argument. Husband put forth evidence that he made the effort to find new employment. At that point, wife should have come forward with evidence of her own to contradict husband's assertion, instead of relying on past salary performance from another metropolitan area that apparently had no relevance in the Cleveland metropolitan market. We therefore sustain the first and second assignments of error and remand for a redetermination of the amount of income to be imputed to husband.

II

The third, fifth, and sixth assignments of error raise issues relating to husband's visitation rights to the child in deviation from standard visitation guidelines, the court's decision to name wife primary caregiver for the child, and the court's failure to grant husband access to the child's records in the same manner that wife, as custodial parent, receives.

A

Husband first complains that the court failed to order visitation in conformity with Loc.R. 18(C) of the Cuyahoga County Court of Common Pleas, Domestic Relations Division. He argues that (1) the court gave him only two weeks' visitation during the summer when Loc.R. 18(C)(5)(a) states that he should have six weeks, (2) the court failed to schedule the child's visitation during his birthday as required by Loc.R. 18(C)(3)(a), and (3) the court failed to schedule visitation for husband on the child's birthday as required by Loc.R. 18(C)(3)(b).

■ R.C. 3109.051(F)(2) provides that the courts of common pleas shall, by rule, adopt standard visitation guidelines. Pursuant to this mandate, the court of common pleas adopted Loc.R. 18(C), which sets forth the standard visitation schedule to be applied in Cuyahoga County. The rule states, "In compliance with O.R.C. 3109.051(F)(2), the following Standard Visitation Guidelines are to be applied in all cases subject to deviation based upon consideration of the factors in O.R.C. 3109.051(D)." The ultimate decision to apply the visitation guidelines rests with the court. *Appleby v. Appleby* (1986), 24 Ohio St.3d 39, 41, 24 OBR 81, 82–83, 492 N.E.2d 831, 833.

■ The court did not state its reasons for deviating from the visitation guidelines. Of the three grounds for complaint in this assignment of error, two of those grounds, the court's failure to order visitation on both husband's and child's birthdays, appear to be oversights by the court. There is nothing in the record that compels the conclusion that the court intentionally decided to omit visitation on these days, and wife does not suggest that visitation on these days would be against the child's best interests. Given the directory nature of Loc.R. 18(C) and the absence of any evidence to suggest a deviation from husband's birthday and child's birthday, we remand to the court so that it may amend its order to incorporate visitation for those days.

As for the court's decision to deviate from the six-week summer visitation, the court's reasons for doing so were obvious enough under the circumstances that we believe that the court's failure to state its reference to the factors contained in R.C. 3109.051(D) did not prejudice husband.

■ The visitation issue arose prior to trial when a social worker with the Family Conciliation Services prepared a report for the court in which she recommended that husband have "primary residency during the summer months," with wife having three weekends per month. Wife, however, retained the services of a clinical psychologist, who disagreed with that recommendation. The psychologist gave a psychology trainee total responsibility for the child's session and later collaborated with the trainee to write a letter to wife's attorney. In that letter (written primarily by the trainee), the psychologist and trainee recounted instances of the child's separation anxiety, demonstrated by regressive behavior (speaking in "baby talk," refusing to sleep in her own bed), and stated:

"I have concerns about the proposed summer schedule. I believe that [the child] is experiencing a good deal of stress associated with the current visitation plan and as a result is not able to cope effectively and age-appropriately with the press of her current situations. As a result, she has manifested the symptoms described above. I believe that it is in this child's psychological best interest that the visitation schedule be altered to provide consistency throughout the year and

that primary residency *not be transferred* to [husband] during the summer months. I believe it is likely that as a result of this change, [the child] may regress developmentally and will continue to experience her current level of fear and anxiety." (Emphasis in original.)

At trial, the psychologist rendered her opinion that the child should have a stable home environment at all times and that extended visitation during the summer would be excessive because it would remove the child from her mother for too long a period of time. The trainee likewise testified that he conducted all the sessions with the child and concluded that her separation anxiety would be lessened if the court were to modify the visitation schedule and create a more stable home environment. The court relied on these opinions and deviated from Loc.R. 18(C) accordingly.

Husband complains that the court should not have placed stock in either opinion. There is some justification for this complaint. The psychologist testified at trial as the child's treating psychologist (not as an expert) and admitted that, while the child and mother had eleven different sessions at her office, she did not personally participate in any of the sessions, instead deferring direct counseling to the trainee. The psychologist admitted that she did not meet husband and, when asked whether she knew whether husband and wife "got along," she replied that she received her information about husband from wife and "the fact that he has made no effort to become involved." Upon further questioning, the psychologist admitted that she did not directly invite husband to participate in the counseling sessions and relied entirely on wife's representations that husband had been asked to join those sessions, a contention husband firmly denied. The trainee also conceded that he was not testifying as an expert. He told the court that he was in no position to make a recommendation about a visitation schedule. He further conceded that he could not testify to the recommendations made in letters sent to the social worker or to wife's attorney, although he wrote the initial draft of the letter and signed that letter along with the psychologist.

Despite our misgivings about the quality of either "opinion," husband did not raise a specific objection to the witnesses' qualifications, so he waived the right to raise any argument in this context. See *State v. Biros* (1997), 78 Ohio St.3d 426, 451–452, 678 N.E.2d 891, 911–913. The testimony admitted into evidence suggested that the child's best interests would be served by maintaining a constant home environment. This meant less summer visitation for husband. Under the circumstances, the court's deviation from the guidelines appeared justified, and we therefore cannot find that the court abused its discretion.

B

Husband next complains about the court's decision to name wife the primary caregiver. He argues that neither the psychologist nor the trainee had any first-hand information about him, nor did they attempt to contact him in order to determine his fitness to be primary caregiver. He also argues that the court disregarded wife's mental and physical limitations.

We review the court's decision to award custody of the child for an abuse of discretion. *Masters v. Masters* (1994), 69 Ohio St.3d 83, 85, 630 N.E.2d 665, 666–667. Moreover, we are mindful that "[w]here an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court." *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 550 N.E.2d 178, syllabus.

R.C. 3109.04(F) sets forth the factors the court must consider in determining the child's best interests when allocating parental rights and responsibilities. The court found that wife had been the primary caregiver of the child and cited the opinions of the social worker, psychologist, and trainee that wife should continue to be primary caregiver. These opinions fall within the parameters of both R.C. 3109.04(F)(1)(c) and (d), the child's interaction and interrelationship with her family, and her adjustment to her home, and were supported by competent evidence.

Husband argues under R.C. 3105.04(F)(1)(e) that wife lacked the physical and mental stability necessary to be primary caregiver, citing wife's blood disease known as idiopathic thrombocytopenic purpura ("ITP"—a blood platelet disorder with effects similar to hemophilia) and several instances where wife allegedly attempted to commit suicide.

Wife testified that she currently sees a physician every eight weeks but has not taken medication for the ITP for six months and has not taken time off from work due to treatments for two years. She stated that the disease does not substantially affect her day-to-day activities, although she tends to tire easily. Because her job affords some flexibility in making appointments, wife has the ability to rest during the day, so her fatigue does not appear to affect her ability to care for the child.

As to her mental health, husband alleged that wife made several suicide attempts before beginning divorce proceedings. Wife completely denied these allegations. We defer to the court's superior opportunity to assess the credibility of the witnesses. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 79–80, 10 OBR 408, 409–411, 461 N.E.2d 1273, 1275–1276. Given the conflicting testimony, the court apparently made a factual determination that allegations of

wife's attempts at suicide were not credible, and we have no basis upon which to overturn that determination.

Finally, husband cites the court social worker's report that expressed the following concerns about wife's family:

"In all fairness to [husband], he maintains that the atmosphere at the maternal grandmother's home is questionable citing that there are individuals, [wife's] brother who is alleged to be an alcohol and drug abuser, and that there is another brother who is mentally retarded who may be aggressive toward [the child]. It is the belief of this writer that access of the maternal grandparents to [the child] be promoted at all costs but that [the child] never be left alone with any other family member without the supervision of the maternal grandmother."

The social worker testified that wife said that there had been limited contact with her family and that wife would not put the child in any situation where she might be harmed. The social worker characterized one brother as "developmentally delayed" but did not believe that he posed any immediate threat to the child. She told the court that she had concerns about husband's strict style of discipline but would not change anything contained in her report. Wife's assurances that her brother would have no contact with child must have persuaded the court.

The evidence suggested that, despite their different approaches to childrearing, either spouse would have been able to fulfill the role of primary caregiver. Wife's physical problems and past conduct, while a genuine concern, nevertheless are not the primary consideration. The consideration is whether those conditions would adversely affect the child's best interests. The court found under the circumstances that child's emotional development would be better served if she remained with wife. This conclusion properly centers on the child's best interests and is supported by competent, credible evidence in the record.

### C

Husband's final contention is that the court erred by failing to provide him complete access to the child's records pursuant to R.C. 3109.051(H)(1) and the child's day care pursuant to R.C. 3109.051(I).

R.C. 3109.051(H)(1) requires the court to grant the nonresidential parent the same access to records as the residential parent has unless the court determines that such access would be against the best interests of the child. If the court decides not to grant the nonresidential parent the same access to records, it must place findings of fact in the record. *Id.* The right to access in this section is self-executing—the court needs to take action only if it intends to deny access to records. Husband is entitled to the same access to the child's records as is wife.

R.C. 3109.051(I), relating to access to child care, is worded differently. That section applies when the court issues a visitation order and states that the court "shall determine whether the parent granted the right of visitation is to be permitted access * * * to any child day-care center that is, or that in the future may be, attended by the children with whom the right of visitation is granted." The section goes on to create a presumption that the nonresidential parent has a full right of access unless the court determines otherwise through written findings of fact and opinions in its journal.

Unlike R.C. 3109.051(H)(1), R.C. 3109.051(I) is not self-executing. It places a mandatory duty on the court to determine the nonresidential parent's right to access at a day care facility. The court failed to make this determination; therefore, we sustain this assignment of error in part and remand with instructions to determine husband's right of access to child's day care facility.

### III

In his fourth assignment of error, husband complains that the court abused its discretion when it ordered him to take out a policy of life insurance and name wife the irrevocable beneficiary during the child's minority. He concedes that the court may order a payor spouse to secure child support payments by taking out a life insurance policy and naming the children beneficiaries, but contends that it is improper to secure child support payments by making the payee spouse the beneficiary of the policy.

The court's order is imprecise. From a technical standpoint, child should be named the irrevocable beneficiary of husband's life insurance policy, since the court order is clearly intended to secure payment of husband's child support obligation. Because child is the only person entitled to the child support payments, her name should appear as sole beneficiary.

It may ultimately be a moot point whether wife is named the beneficiary of the policy because the law is clear that all proceeds, if any, of the life insurance policy would be held in constructive trust for child, regardless whose name appeared on the policy. See *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph two of the syllabus. Nevertheless, wife conceded that she should not have been irrevocable beneficiary of the insurance policy. In order to avoid future confusion and, in light of our remand on other issues, we believe that the court should clarify this portion of its journal entry to specify that child be named irrevocable beneficiary of husband's $100,000 life insurance policy only until husband's duty of support ceases. See *Gillespie v. Gillespie* (June 30, 1994),

Cuyahoga App. No. 65518, unreported, 1994 WL 317785. The fourth assignment of error is sustained.

## IV

The seventh assignment of error relates to the court's findings relating to what items constituted marital property, the valuation of some of that property, and the court's division of that marital property. Husband points specifically to the court's valuation of wife's automobile and her jewelry.[1]

 The division of marital property is governed by R.C. 3105.171. The division of marital property must be equal, unless the court determines that equity requires otherwise. See R.C. 3105.171(C)(1). When making a distributive award of marital property, the court must consider all of the factors set forth in R.C. 3105.171(F). The facts and circumstances of each case dictate what is an equitable division of marital property. *Terry v. Terry* (1994), 99 Ohio App.3d 228, 232, 650 N.E.2d 184, 186–187. The court is required to set forth the basis of its award in sufficient detail to permit the reviewing court to determine that the award is fair. *Kaechele v. Kaechele* (1988), 35 Ohio St.3d 93, 518 N.E.2d 1197, paragraph two of the syllabus. If the court does not address the factors set forth in R.C. 3105.171 in arriving at its division of marital property, it will constitute an abuse of discretion. *Bisker v. Bisker* (1994), 69 Ohio St.3d 608, 609, 635 N.E.2d 308, 309.

Husband's first complaint goes to wife's 1992 automobile, which the court found had a net equity of $1,400. At trial, wife testified that the car had a value of $10,000, with one $320 payment remaining. She testified that in January 1996, she handed title to the automobile over to her credit union in exchange for an $8,000 loan. Of that amount, she paid $6,000 to her attorney and bought furniture with the remaining amount.

 In divorce cases, we presume that the date of the final hearing is the appropriate termination date of the marriage unless the court, in its discretion, uses a *de facto* termination. See R.C. 3105.171(A)(2); *Berish v. Berish* (1982), 69 Ohio St.2d 318, 321, 23 O.O.3d 296, 298, 432 N.E.2d 183, 185. To show that the court abused its discretion by selecting a *de facto* termination date of the marriage, a party must demonstrate that the court's decision was unreasonable, recognizing that dates selected for the determination and valuation of assets available for equitable distribution "must be dictated largely by pragmatic considerations" that will differ from case to case. *Id.* at 319, 23 O.O.3d at 297,

---

1. Wife did not respond to this assignment of error, so we accept husband's statement of the facts as accurate. Cf. App.R. 18(C).

432 N.E.2d at 184. The court's decision to use a *de facto* termination date for the marriage is subject to an abuse of discretion standard of review.

In his brief, husband claims that the court determined August 25, 1995 to be the *de facto* termination of the marriage. This may overstate the case. In its judgment entry, the court ordered husband to pay wife "one-half the debt accumulated through the de facto termination of the marriage." It cannot be said from this single line alone that a *de facto* termination date had been established.

Nonetheless, we find under the circumstances that the court's intent must have been to find that the *de facto* termination of the marriage occurred on August 25, 1995. Both wife and husband testified that wife moved out of the marital residence on that date, and there is no indication in the record to show that the parties cohabitated after that date. See *Gullia v. Gullia* (1994), 93 Ohio App.3d 653, 666, 639 N.E.2d 822, 829–830. Moreover, by using the phrase "de facto termination of the marriage," the court necessarily indicated its intent to choose a termination date different from the date of its divorce decree. In domestic relations cases, the term "*de facto* termination" is a term of art having particular significance when used in conjunction with orders dividing marital property. The court's use of that phrase could only indicate its desire to find that the marriage terminated prior to the effective date of the divorce decree, and the only plausible date for that termination is August 25, 1995.

Using that date as the termination of the marriage, we find that the court abused its discretion by listing the $8,000 lien on wife's car as a marital debt. Wife used the remaining $2,000 to buy furniture for her and the child. At the very least, the monies used for attorney fees were paid for debts that arose after the *de facto* termination date of the marriage. The attorney fees should have been separated from other pre-existing marital debts.

We also agree with husband that the court abused its discretion by awarding jewelry to wife without first setting a value on that jewelry. At trial, husband testified that wife accumulated jewelry worth $6,000 to $7,000 during the marriage. Wife did not contradict this valuation. The court's judgment entry merely awards wife "all of her jewelry," without regard to its value. The court fails to fulfill its duty to divide equitably marital property if it fails to determine the value of a marital asset. *Eisler v. Eisler* (1985), 24 Ohio App.3d 151, 152, 24 OBR 240, 241, 493 N.E.2d 975, 976. While the trial court has broad discretion to determine the value of marital property, the court "is not privileged to omit valuation altogether." *Willis v. Willis* (1984), 19 Ohio App.3d 45, 48, 19 OBR 112, 115, 482 N.E.2d 1274, 1277.

The court's failure to consider wife's loan and the value of her jewelry necessarily skewed its calculation of the value of marital property. We therefore sustain this assignment of error.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

BLACKMON, A.J., and KARPINSKI, J., concur.