DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, which granted plaintiff-appellee, Cheryl L. Syslo, a divorce from defendant-appellant, James L. Syslo, and addressed the issues of child custody and visitation, child support, property and debt distribution and spousal support. Appellant now challenges virtually every aspect of the trial court's order, raising the following assignments of error on appeal:
Assignment of Error Number One
 {¶ 2} "The court erred in its final judgment of divorce in rendering a division of property, as said division was inequitable to appellant and constituted an abuse of discretion and was therefore error."
Assignment of Error Number Two
 {¶ 3} "The court erred by finding appellant guilty of financial misconduct with or without finding proof of said alleged financial conduct by clear and convincing evidence including but not limited to (1) including non-marital property into the alleged assets diverted [sic] (2) not delineating clearly what the financial misconduct comprised [sic] (3) not finding specific profit to defendant, (4) not finding wrongdoing by defendant, (5) considering actions that occurred four years prior to final hearing and after prior divorce actions [sic] (7) not finding a precise amount of assets involved, (8) whether the conduct occurred within the context of prior divorce actions — thus being a matter of res judicata or other bar."
Assignment of Error Number Three
 {¶ 4} "The court erred by not finding appellee guilty of financial misconduct and/or penalizing appellee in proportion to the amount she misappropriated."
Assignment of Error Number Four
 {¶ 5} "The court erred in its decision and order in this case by failing to take in account all federal and state income tax implications as to appellant and appellee in this matter in its order allocating property between said parties."
Assignment of Error Number Five
 {¶ 6} "The court erred in granting custody of the minor child to appellee."
Assignment of Error Number Six
 {¶ 7} "The court erred in granting appellant (defendant) only supervised visitation and companionship rights with the minor child of the parties."
Assignment of Error Number Seven
 {¶ 8} "The court committed error in arriving at both child support levels and spousal support in assigning or determining that appellant's annual income to be $110,000.00 and conversely only determining appellee's effective income to be $20,000.00."
Assignment of Error Number Eight
 {¶ 9} "The court erred in requiring the appellant to pay all marital debt of the parties."
Assignment of Error Number Nine
 {¶ 10} "The court erred in granting appellee spousal support (as well as granting as must as it did and as to the amount of time.)"
Assignment of Error Number Ten
 {¶ 11} "The court erred by the bias demonstrated in questioning appellant and/or attacking defendant's credibility in the process."
Assignment of Error Number Eleven
 {¶ 12} "The court erred in requiring the defendant to pay plaintiff's (appellee's) attorney fees in the amount of $7,000.00."
 {¶ 13} Appellant and appellee were married on June 12, 1984 in Toledo, Ohio. One child, Grant (DOB September 30, 1985) was born issue of the marriage. During the course of the marriage, the parties lived in various locations throughout the United States due to appellant's work as a consultant to the nuclear power industry. Despite frequent moves, appellant's job required that he often travel away from home for weeks at a time, working at times 70 to 80 hours per week. As such, appellee was the primary care giver to Grant and did not work outside of the home.
 {¶ 14} In the spring of 1996, appellee left the marital home in Wilmington, North Carolina and returned to Toledo to care for her dying mother. She subsequently brought Grant to Toledo, and the parties separated on April 10, 1996. Thereafter, appellant filed for divorce in North Carolina. That case was transferred to Ohio but was ultimately dismissed. On September 11, 1997, appellee filed a complaint for divorce in the court below, seeking custody of Grant, child and spousal support, attorney fees and a reasonable division of marital property. Appellant answered and filed a counterclaim for divorce which also sought custody of Grant, an equitable division of marital property, attorney fees and an order that appellee pay the debts of the marriage. The trial court subsequently filed orders appointing a guardian ad litem for Grant and ordering that appellant, appellee and Grant undergo psychological evaluations.
 {¶ 15} On November 7, 1997, the trial court issued a magistrate's temporary order which, in pertinent part, designated appellee as the residential parent and legal custodian of Grant; awarded appellant supervised visitation and companionship with Grant; ordered appellant to pay appellee as temporary child support $712.59 per month through wage withholding effective October 10, 1997; ordered appellant to provide health insurance coverage for Grant and maintain any existing health and life insurance policies covering appellee; ordered appellant to pay temporary spousal support of $1,250 per month by wage withholding effective October 10, 1997; ordered the parties to pay their own living expenses; ordered appellant to pay certain monthly credit card bills; and ordered appellant to comply with the court's medical schedule which required appellant to be responsible for Grant's medical insurance and medical expenses.
 {¶ 16} On June 4, 1998, the case came before the lower court for a trial on the issues of grounds for divorce, child custody and financial issues. At that trial, the following evidence was presented.
 {¶ 17} Appellee testified that since Grant was born, she has been his primary caretaker and that appellant was frequently away from the marital home on business. As such, she stated, appellant was not active in Grant's upbringing. Appellee stated that Grant has had emotional problems since around the age of three and has had a problem with his weight, which appellee characterized as an eating disorder. In her estimation, the frequent moves necessitated by appellant's profession were difficult on Grant and caused him to have problems adjusting. Because of Grant's problems, appellee has taken him to therapists intermittently since the problems began and has worked to keep him involved in sports programs. Appellee further testified that since she moved to Toledo in the spring of 1996, appellant has only had sporadic contact with Grant and that this has troubled Grant tremendously. With regard to child support, appellee stated that appellant has given her very little toward Grant's support since they separated and that she has been living off of an inheritance from her mother, who died in May 1996. She further testified that although she believes appellant is presently living with a brother in Fort Lauderdale, Florida, appellant never told her where he moved to after leaving North Carolina and never provided her with his address and telephone number. As such, with regard to custody and visitation, she is uncomfortable with the idea of putting Grant on a plane to visit his father when appellant has not been forthcoming as to his whereabouts. Appellee added that the contact that appellant has had with Grant has been upsetting to Grant because appellant frequently makes derogatory comments about appellee. Appellee further expressed her fear that appellant would kidnap Grant and take him out of the country. This fear was evidently based on statements that appellant made to several people indicating that he wanted to kidnap Grant. Finally, although appellee admitted occasionally smoking marijuana when she lived in North Carolina, she stated that she has not smoked any since she moved to Toledo.
 {¶ 18} With regard to the financial issues, appellee testified that, at the time of the trial, she was 40 years old, had a high school education and, over the past 15 years, had only worked for three months at a jewelry store. Her intent was to obtain her real estate license and pursue a career as a real estate agent. Appellee stated that during the course of the marriage, appellant earned over $100,000 per year but that in his last job he earned about $78,000 per year. Despite his income, appellant was, as of June 3, 1998, $17,120.38 in arrears on his child and spousal support payments. She further stated that appellant was in arrears on other bills that he had been ordered to pay in the magistrate's order of November 6, 1997. In particular, appellee stated that appellant had failed to maintain health insurance for Grant. As a result, appellee paid $1,139.35 in medical bills for Grant.
 {¶ 19} With regard to the parties' marital assets, appellee testified that the parties sold their marital home in the fall of 1996 and split the proceeds of that sale. Accordingly, there was no marital home or mortgage. Appellee did, however, testify that the parties had acquired significant personal property during their marriage. Nevertheless, she stated that after she left the marital home and moved to Toledo, appellant sold much of that property at garage sales without her knowledge or consent. Regarding that property, appellee prepared lists of items sold and estimated values of those items. Appellee stated that she estimated the values by researching catalogs, antique shops and talking to antique dealers. Based on these estimates, appellee testified that appellant sold appellee's premarital property worth $3,500, Grant's property worth $14,049, appellee's daughter Nicole's property worth $3,320 and the parties' marital property worth $74,691. She further stated that personal property that had been gifted to her by family members and friends and valued at $11,524 was also missing.
 {¶ 20} Appellee also testified that the monthly expenses for her and Grant totaled $3,500 and that because appellant has not been making his support payments, she has been living off of an inheritance from her mother. When appellee's mother died, appellee inherited cash equivalents of $149,000, a home worth $60,000 and a car. Appellee stated, however, that the inheritance is nearly gone. Finally, appellee testified that as of the date of the trial, she owed $4,812 in attorney fees and that she believed those fees were fair and reasonable.
 {¶ 21} On the issue of custody, appellant testified that despite his frequent absences from home, he and Grant are very close and that he participated fully in his upbringing. He stated that when he was home, Grant was very attached to him and that when he would leave, Grant would often scream and cry for days. Since he and appellee separated, however, appellant stated that appellee has restricted him from seeing or talking to Grant and that he has only seen Grant three times since April 1996. He then stated that he attempts to call Grant once a week but the phone goes unanswered and his messages are not returned. If granted custody, appellant testified that he would live with Grant in Fort Lauderdale, Florida with his, appellant's, brother until he obtained his own residence. Appellant stated that he is not presently employed but that once he does find employment, he has family in the Fort Lauderdale area that can help with babysitting services. He also testified that he will not take a job that requires him to travel and that he will only work Monday through Friday from 8:00 a.m. to 5:00 p.m. Appellant further stated that he was looking for any type of engineering job in the Fort Lauderdale area and that he had circulated his resume with National Technical Engineering Services, requesting a home based job that did not require travel. At the time of the hearing below, however, appellant had been unemployed since November 1997.
 {¶ 22} Appellant also testified regarding the parties' financial issues. Appellant stated that he has degrees in psychology, nuclear engineering and mechanical engineering and that the highest annual gross income he had ever received was approximately $200,000. Appellant further testified that he had been employed at the Fluor Daniel Corporation in Greenville, South Carolina until November 1997, when he was given the option of resigning or being fired. Appellant explained that the excessive outstanding marital debts as well as the garnishment on his wages made him unfit for duty under the federal guidelines for employees of the nuclear power industry. He therefore chose to resign. Since then, appellant's only source of income has been an $85 per month United States veterans disability check. Appellant further testified that while at Fluor Daniel, his gross salary was $68,000 per year but that he had numerous unreimbursed business expenses he was required to cover. Given these expenses, appellant testified that his adjusted gross income for the year 1997 was $4,082.40 and that for the year 1995 he had a loss of $20,831.91. Appellant's 1996 federal income tax return submitted into evidence below showed that appellant had gross income from Fluor Daniel of $69,395.17. Since he left Fluor Daniel, appellant has been living with and supported by his brother in Florida. As such, appellant testified that he gave the parties' entire 1997 federal income tax refund check of $12,764.96 and the 1997 state income tax refund check of $4,000 to his brother to repay him for money he had borrowed.
 {¶ 23} Regarding the parties' marital debt, appellant testified that after the marital home was sold and the mortgage paid, the remaining marital debt totaled approximately $70,000. Since that time, however, appellant has reduced those debts to approximately $24,412.99. Nevertheless, appellant stated that he did not have the income to keep up with the monthly support payments and pay the other debts of the marriage and, so, the support arrearage accumulated. That is, appellant testified that it was financially impossible for him to make all of the payments required of him. Appellant denied having any interest in any retirement plans.
 {¶ 24} In addition to the parties, Colleen Dooley, the guardian ad litem appointed for Grant, testified at the trial below. Dooley stated that in her investigation, she spoke with appellant, appellee and Grant, reviewed documents provided by appellant, spoke with Grant's prior therapist, reviewed the court counselor's and psychologist's reports and spoke with the court counselor and psychologist. In addition, she reviewed a lengthy "diary" prepared by appellant concerning his relationship with appellee and the history of their marriage. Dooley initially submitted a report and recommendation in June 1997 for the previous divorce case. In that report, Dooley recommended that appellee be designated the residential parent and legal custodian and that appellant be granted supervised visitation. At the trial below, Dooley stated that when she wrote her report she was concerned that appellant would try to take Grant and flee the jurisdiction. Since that time, appellant and Grant had been evaluated by Dr. Eric Nicely, who believed that Grant was old enough to protect himself from an abduction. Nevertheless, Dooley stated that she had lingering concerns about appellant. In particular, she noted that when appellant does have contact with Grant he says negative things about appellee and claims he is homeless and has no food. These comments upset Grant and Grant believes that his father is not truthful. Appellant also sends Grant cards in which he refers to appellee as a liar. These cards are also distressing to Grant. In addition, Dooley stated that appellant's diary demonstrates that appellant has lost his focus with respect to appellee and that he may do things to punish her. Appellant's diary includes the following statements: "Cheryl is now completely devoid of any decent human characteristics such as honesty, honor, respect for the law, trustworthiness, love, faithfulness, etc. * * * What is left is a psychotic, twisted, fundamentally evil individual who believes she is completely above the law and believes her ends justify her means. * * * She has become a lieing [sic], cheating, drug abusing, drug dealing, thieving, murdering, adulterous whore who has zero socially redeeming traits left within her. She was an unfit wife, is an unfit mother, and is unfit to freely inhabit and wonder about this earth with other decent human beings." Accordingly, Dooley recommended that appellant's visitation begin in Toledo and that, if that is successful, then sometime in the future Grant be allowed to travel to his father's home if appellant provides appellee with his address and telephone number.
 {¶ 25} On April 9, 2001, the trial court issued a decision and judgment entry of divorce. After granting appellee a divorce from appellant, the court granted appellee custody of Grant and awarded appellant supervised visitation to take place in Toledo. The court then ordered appellant to pay monthly child support of $987.03. This figure was reached by imputing to appellant $110,000 in annual income and imputing to appellee $20,000 in annual income. The court further awarded appellee a lump sum judgment of $17,120.38 for the unpaid child and spousal support arrearage and ordered that that judgment was not merged in the final judgment of divorce. Next, the court ordered appellant to pay appellee $1,209.81 for medical expenses that appellee was required to pay for herself and Grant as a result of appellant's quitting his job and depriving the family of health insurance. The court further awarded appellee the income tax exemption for Grant until appellant was current on his child support obligation. The court then distributed the parties' property and debts as follows. Appellee was awarded as her separate property the cash, real estate and personalty she inherited from her mother's estate. Both parties were awarded all the personal property and vehicles in his or her possession. Then, finding that appellant committed financial misconduct by giving the parties' income tax refund check of $12,764 to his brother and in selling the bulk of the parties' marital property, the court awarded appellee a distributive award of $75,000. As an additional distributive award, the court ordered appellant to pay all of the debts of the marriage, including appellee's debts of $14,350 which, the court found, she incurred as a result of appellant's failure to pay the court ordered support. The court determined that if appellant had not quit his job, appellee would not have incurred these debts. With regard to spousal support, the court awarded appellee $1,000 per month for five years, modifiable and terminable upon the death of either party or the remarriage of appellee. Finally, the court awarded appellee $7,000 in attorney fees and found that these fees were reasonable. It is from that judgment that appellant now appeals.
 {¶ 26} We will first address the fifth and sixth assignments of error as they challenge the custody aspects of the trial court's order. Appellant asserts that the trial court erred in awarding appellee custody of Grant and awarding appellant only supervised visitation with Grant. Specifically, appellant contends that in awarding appellee custody of Grant, the court ignored uncontradicted evidence that appellee regularly smoked marijuana. Appellant also asserts that the court's concern that appellant could abscond with Grant was unsupported by the record.
 {¶ 27} R.C. 3109.04(B)(1) requires a trial court to consider the best interest of the child in making an award of custody incident to a divorce proceeding. R.C. 3109.04(F)(1) provides that in making this determination, a court is to consider all relevant factors, including, but not limited to:
 {¶ 28} "(a) The wishes of the child's parents regarding his care;
 {¶ 29} "* * *
 {¶ 30} "(c) The child's interaction and interrelationship with his parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 31} "(d) The child's adjustment to his home, school, and community;
 {¶ 32} "(e) The mental and physical health of all persons involved in the situation;
 {¶ 33} "(f) The parent more likely to honor and facilitate visitation and companionship rights approved by the court;
 {¶ 34} "(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
 {¶ 35} "* * *
 {¶ 36} "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."
 {¶ 37} A trial court is given broad discretion in custody determination matters. Trickey v. Trickey (1952), 158 Ohio St. 9, 14. In reviewing a trial court's custody determination, an appellate court must uphold the decision absent an abuse of discretion. Sayre v.Hoelzle-Sayer (1994), 100 Ohio App.3d 203, 210. Accordingly, absent a showing that the trial court's attitude was unreasonable, arbitrary or unconscionable, this court will affirm the trial court's custody determination. Id. Moreover, it is the trial court that must determine factual disputes and "weigh the testimony and credibility of witnesses,"Gardini v. Moyer (1991), 61 Ohio St.3d 479, 484, and this court will not entertain those tasks upon appellate review.
 {¶ 38} This court has thoroughly reviewed the entire record of the trial court proceedings. From our review, it is clear that the trial court considered all of the relevant factors set forth in R.C.3109.04(F)(1) in determining the best interest of Grant and in awarding his custody to appellee. While there was evidence that appellee had used marijuana in the past, she testified that she had not smoked it since she moved to Toledo, two years before the trial below. The trial court found her testimony to be credible. In addition, appellant's failure to pay child support resulting in a substantial arrearage and the fact that he lives in Florida are both factors supporting an award of custody to appellee. Accordingly, we cannot say that the trial court erred in awarding custody of Grant to appellee and the fifth assignment of error is not well-taken.
 {¶ 39} With regard to the issue of visitation, R.C. 3109.051(A) provides that if a divorce proceeding involves a child and the court has not issued a shared parenting decree, the court shall make a just and reasonable order permitting the nonresidential parent to visit the child at the time and under the conditions that the court directs. R.C.3109.051(D) then provides in relevant part that in determining whether to grant visitation rights to a parent, in establishing a specific visitation schedule, and in determining other visitation matters, the court shall consider all of the following factors:
 {¶ 40} "(1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity * * *;
 {¶ 41} "(2) The geographical location of the residence of each parent and the distance between those residences * * *;
 {¶ 42} "(3) The child's and parents' available time, including but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;
 {¶ 43} "(4) The age of the child;
 {¶ 44} "(5) The child's adjustment to home, school, and community;
 {¶ 45} "* * *
 {¶ 46} "(7) The health and safety of the child;
 {¶ 47} "* * *
 {¶ 48} "(9) The mental and physical health of all parties;
 {¶ 49} "(10) Each parent's willingness to reschedule missed visitation and to facilitate the other parent's visitation rights * * *;
 {¶ 50} "* * *
 {¶ 51} "(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's rights to visitation in accordance with an order of the court;
 {¶ 52} "(14) Whether either parent has established a residence or is planning to establish a residence outside this state;
 {¶ 53} "(15) Any other factor in the best interest of the child."
 {¶ 54} As with other child custody matters, visitation rights and the terms of visitation are within the sound discretion of the trial court. In re Whaley (1993), 86 Ohio App.3d 304, 317. Appellant asserts that through its order, the court failed to include a specific visitation schedule as required by R.C. 3109.051(A). We disagree. The court in its order specifically referred to the court's long distance parenting schedule. That schedule sets forth the times when the non-residential parent can visit with the child. In the present situation, however, the court ordered the visits to be supervised by Margaret Toadvin under the terms and conditions as she may direct. In reaching this decision, the court stated that it considered a number of factors, including the court-appointed psychologist's determination that appellant was "clinically defensive," displaying qualities of denial and intolerance, the guardian ad litem's recommendation that visitation be supervised, the guardian ad litem's concern that messages and cards appellant had left for Grant were highly critical of appellee and therefore distressing to Grant, and the fact that appellant was not forthcoming about his residence or housing accommodations.
 {¶ 55} Given these factors, we cannot say that the trial court erred in ordering supervised visitation. Accordingly, the sixth assignment of error is not well-taken.
 {¶ 56} We will next address appellant's seventh assignment of error which challenges the trial court's order of child support. Appellant asserts that the trial court erred in imputing to him annual income of $110,000 and, conversely, only imputing annual income of $20,000 to appellee. Based on these erroneous figures, appellant asserts that the court erred in its determination of child support.
 {¶ 57} R.C. 3113.215[1], which sets forth the calculation standards for determining child support, provides in relevant part:
 {¶ 58} "(A) As used in this section:
 {¶ 59} "(1) `Income' means either of the following:
 {¶ 60} "* * *
 {¶ 61} "(b) For a parent who is unemployed or underemployed, the some of the gross income of the parent, and any potential income of the parent.
 {¶ 62} "* * *
 {¶ 63} "(5) `Potential income' means both of the following for a parent that the court * * * determines is voluntarily unemployed or voluntarily underemployed:
 {¶ 64} "(a) Imputed income that the court * * * determines the parent would have earned if fully employed as determined from the parent's employment potential and probable earnings based on the parent's recent work history, the parent's occupational qualifications, and the prevailing job opportunities and salary levels in the community in which the parent resides[.]"
 {¶ 65} In construing this section of the Revised Code, the Supreme Court of Ohio has specified that: "Whether a parent is `voluntarily underemployed' within the meaning of R.C. 3113.215(A)(5), and the amount of `potential income' to be imputed to a child support obligor, are matters to be determined by the trial court based upon the facts and circumstances of each case. The determination will not be disturbed on appeal absent an abuse of discretion." Rock v. Cabral (1993),67 Ohio St.3d 108, the syllabus. Nevertheless, a court's failure to consider all three factors, that is "(1) the parent's employment potential and probable earnings based on the parent's recent work history, (2) job qualifications, and (3) the prevailing job opportunities and salary levels in the community in which the parent resides," in imputing income does constitute an abuse of discretion. Badovick v.Badovick (1998), 128 Ohio App.3d 18, 23.
 {¶ 66} In the present case, the trial court imputed income of $110,000 to appellant "based on his former earnings and his proximity to a similar employment." Clearly, the court never considered appellant's employment potential or the prevailing job opportunities and salary levels in the Fort Lauderdale, Florida area. Similarly, the court imputed income of $20,000 to appellee without a finding that she was voluntarily unemployed or voluntarily underemployed. In order to impute
income on an individual for purposes of a child support calculation, a court must first determine that the parent is voluntarily underemployed or voluntarily unemployed. Badovick at 23. Accordingly, we must conclude that the trial court erred in ordering child support based on imputed income. Accordingly the seventh assignment of error is well-taken.
 {¶ 67} In his first, second, third, fourth and eighth assignments of error, appellant challenges the trial court's division of the parties' marital property and debt, its finding that appellant was guilty of financial misconduct, its failure to find appellee guilty of financial misconduct, and its failure to consider the tax implications in its allocation of property between the parties.
 {¶ 68} The Supreme Court of Ohio has long recognized that a trial court is vested with broad discretion in fashioning its division of marital property. Bisker v. Bisker (1994), 69 Ohio St.3d 608, 609. R.C. 3105.171(B) and (C)(1) provide that in a divorce proceeding, all marital property is to be divided equally unless an equal division would be inequitable. If an equal division would be inequitable, that marital property is to be divided in an equitable manner. Moreover, R.C.3105.171(E)(3) provides that if a spouse has engaged in financial misconduct, including but not limited to, the dissipation, destruction, concealment or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property. Finally, in making a division of marital property or a distributive award, the trial court is required to consider all nine factors listed in R.C. 3105.171(F) and make written findings of fact to support its determination. The factors the court is to consider are: (1) the duration of the marriage, (2) the assets and liabilities of the parties, (3) the desirability of awarding the marital home to the spouse with custody of the children, (4) the liquidity of the property to be distributed, (5) the economic desirability of retaining intact an asset or an interest in an asset, (6) the tax consequences of the property division, (7) the costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property, (8) any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses, and (9) any other factor that the court expressly finds to be relevant and equitable.
 {¶ 69} An appellate court, when reviewing a trial court's property division, must consider the distribution in its entirety under the totality of the circumstances and we will not reverse the trial court's judgment absent an abuse of discretion. Jelen v. Jelen (1993),86 Ohio App.3d 199, 203.
 {¶ 70} In addressing the property and debt issues, the lower court first concluded that appellant was guilty of financial misconduct by selling or disposing of the marital property, tax refunds and appellee's personal property. This conclusion is supported by the record. Appellant stated in his "diary" that he had four garage sales through which he sold the bulk of the parties' marital property. He also stated in that "diary" that from those garage sales he netted approximately $7,400. Appellant further admitted in the proceedings below that he gave his federal income tax refund check of $12,764 and his state income tax refund check of $4,000 to his brother. All of these assets were marital property of which appellant had no right to dispose. Moreover, appellant's sale of the marital property deprived appellee of substantial personal property and a distribution of marital assets. Appellee presented a list of the marital property which was missing and testified that the property totaled approximately $75,000 in value. She further stated that her own personal property worth approximately $11,524 was missing. Although the court noted in its decision that some of the values of the property seemed high, the court also noted that appellant did not dispute the values. The record supports that conclusion. Upon review, we cannot say that the trial court erred in finding that appellant committed financial misconduct and the second assignment of error is not well-taken.
 {¶ 71} In his third assignment of error, appellant contends that the court erred in not finding that appellee had committed financial misconduct by misrepresenting the values of the marital property that appellant sold. The record, however, is clear. At the proceedings below, appellant did not challenge appellee's valuations. Accordingly appellant has waived any claim of financial misconduct on the part appellee and the third assignment of error is not well-taken.
 {¶ 72} Under his fourth assignment of error, appellant asserts that the trial court failed to consider the tax consequences of the property distribution as required by R.C. 3105.171(F). Pursuant to R.C.3105.171(F)(6) a trial court is required to consider the tax consequences of a property division. A court should not, however, speculate as to potential tax consequences. James v. James (1995), 101 Ohio App.3d 668,688. "For example, if the award is such that, in effect, it forces a party to dispose of an asset to meet obligations imposed by the court, the tax consequences of that transaction should be considered." Day v. Day
(1988), 40 Ohio App.3d 155, 159. Where, however, an appellant has failed to produce evidence of tax consequences in the trial court, or where nothing in the record suggests that an asset must be liquidated, tax consequences are speculative and need not be considered. See White v.White (Feb. 18, 1998), Summit App. No. 18275.
 {¶ 73} In the present case, appellant presented no evidence of potential tax consequences associated with the division of marital assets and any attempt by the trial court to consider the tax consequences of its division would be speculative and without evidentiary support. Because the parties essentially had no assets requiring liquidation, they would not incur any adverse tax consequences. The fourth assignment of error is therefore not well-taken.
 {¶ 74} In appellant's first and eighth assignments of error, he challenges the actual distribution of property and debt made by the trial court. Appellant asserts that through its order, the trial court awarded appellee all of the assets of the marriage and ordered him to pay all of the debts of the marriage and that the award was therefore inequitable. The trial court's order, however, is clear that the only marital property awarded to the parties was the personal property and cars that they each had in their possession. The parties had no savings, retirement accounts or real estate to distribute. Because appellant had sold the bulk of the parties' marital property, the court awarded the only marital property left to distribute. In this context, it is noteworthy that appellant realized approximately $24,169 from the garage sales and tax refunds. Although the court did award appellee a distributive award of $75,000, that award was separate and apart from the property distribution and was in essence punishment for appellant's financial misconduct in selling the marital property and cashing the tax refund checks. Such a distributive award for financial misconduct is clearly permitted under R.C. 3105.171. Moreover, the amount of the award appears to be equal to the value that appellee placed on the marital property which appellant sold. Although appellant questions these values, the credibility of witnesses and the weight to be given their testimony are issues for the trier of fact and we will not substitute our judgment for that of the trial court on that issue. Seasons Coal Co. v. City of Cleveland (1984), 10 Ohio St.3d 77,81. In that appellant obtained approximately $24,000 in marital property through the sale of the parties' personal property and the cashing of the tax refund checks, we cannot say that the trial court abused its discretion in granting appellee the distributive award as it did.
 {¶ 75} With regard to the parties' debts, the trial court ordered appellant to pay the remaining debts of the marriage (appellant's debts of $24,412 and appellee's debts of $14,350) as a distributive award for appellant's financial misconduct in quitting his job and becoming voluntarily unemployed. In making this decision, the court expressly found that appellee's debts of $14,350 were nearly equal to appellant's support arrearage and that appellee, in all likelihood, would not have accumulated these debts had appellant maintained his job and his support payments. The court further ordered appellant to pay medical expenses of appellee and Grant totaling $1,208 for the reason that had appellant not quit his job the parties and Grant would not have been denied medical insurance and thus would not have incurred the debt.
 {¶ 76} Viewing the property and debt distribution as a whole, we cannot find that the trial court abused its discretion making the award as it did. The first and eighth assignments of error are therefore not well-taken.
 {¶ 77} In his ninth assignment of error, appellant challenges the trial court's spousal support award. A trial court has broad discretion in determining spousal support. Kunkle v. Kunkle (1990), 51 Ohio St.3d 64,67. Absent an abuse of that discretion, a reviewing court may not substitute its judgment for that of the trial court. Holcomb v. Holcomb
(1989), 44 Ohio St.3d 128, 131. The purpose of spousal support is to provide for the financial needs of the ex-spouse. R.C. 3105.18(A); Moellv. Moell (1994), 98 Ohio App.3d 748, 751. Although a court's decision to award spousal support is discretionary, trial courts are statutorily mandated to determine whether support is appropriate and reasonable and to consider the factors enumerated in R.C. 3105.18(C), which include but are not limited to: (1) the income of both parties, (2) the relative earning abilities of the parties, (3) the ages and physical, mental and emotional conditions of the parties, (4) the retirement benefits of the parties, (5) the duration of the marriage, (6) the standard of living the parties established during the marriage, (7) the relative education of the parties, (8) the relative assets and debts of the parties, including but not limited to any court-ordered payments by the parties, (9) the time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training or job experience, and employment, is in fact sought, (10) the tax consequences for each party of an award of spousal support, and (11) any other factor that the court expressly finds to be relevant and equitable.
 {¶ 78} In its decision and judgment entry, the lower court awarded appellee $1,000 per month spousal support for five years but did not set forth its reasons for the award. The court did, however, note at other parts of its decision that appellant has three college degrees, that appellant has earned no less than $75,000 per year in the nuclear power industry and as much as $200,000 in one year, that appellee has always been a homemaker with few marketable skills, that appellee is capable of minimum wage employment, and that appellee inherited $149,000 from her mother. Other evidence presented at the trial below revealed that both parties are in good health, neither party has any retirement benefits, the parties were married for approximately twelve years before appellant initially filed for divorce in North Carolina, and the parties essentially have no marital assets because appellant sold them. In addition, appellee testified that although she did inherit $149,000 from her mother, that sum is nearly depleted because appellant failed to comply with the court's interim spousal and child support orders. In light of this evidence, we cannot say that the trial court erred in its award of spousal support and the ninth assignment of error is not well-taken.
 {¶ 79} In his eleventh assignment of error, appellant asserts that the trial court erred in awarding appellee attorney fees of $7,000 in light of the fact that appellant has no assets from which to pay the fees and given that appellee only asserted a claim for attorney fees of $4,800.
 {¶ 80} R.C. 3105.18(H) provides that a trial court may award reasonable attorney fees to either party during any stage of a divorce proceeding. In order to make such an award, the court must determine whether the payor has the ability to pay the attorney fees it awards and whether either party would be prevented from fully litigating his or her rights and adequately protecting his or her interests if attorney fees were not awarded. The trial court's decision regarding attorney fees must be equitable, fair, and serve the ends of justice. Bowen v. Bowen
(1999), 132 Ohio App.3d 616, 642. An appellate court will only disturb a trial court's decision as to attorney fees if the trial court abused its discretion. Id.
 {¶ 81} In its decision and judgment entry, the trial court awarded appellee $7,000 in attorney fees and found that the fees were reasonable given the duration and difficulty of the case. At the trial below, appellee asked the court to award her $4,812 in attorney fees incurred in the present case and presented her attorney's fee statement in support of that request. In awarding attorney fees, the trial court did not make a determination that appellant had the ability to pay that amount and further failed to determine whether either party would be prevented from fully litigating his or her rights or protecting his or her interests if the fees were not awarded. In addition, no evidence was presented on these factors. Accordingly, we must conclude that the court erred in awarding appellee attorney fees. The eleventh assignment of error is therefore well-taken.
 {¶ 82} Finally, in his tenth assignment of error, appellant asserts that the trial court demonstrated bias against him in questioning him from the bench and attacking his credibility. Appellant contends that the trial court's bias against him can be seen in the court's questioning of him about his tax return and the court's statement that it was "just testing a little credibility."
 {¶ 83} Evid.R. 614(B) provides that the court "may interrogate witnesses, in an impartial manner, whether called by itself or a party." Unless there is a showing of bias, prejudice, or prodding of a witness to elicit partisan testimony, it is presumed that the trial court acted impartially in questioning a witness as to a material fact or to develop the truth. Jenkins v. Clark (1982), 7 Ohio App.3d 93, 98. During the course of its examination, the court may, in the interests of justice, ask proper questions of witnesses, even if these are leading questions. Id. at 97, citing Gilhooley v. Columbus Ry. Power Light Co.
(1918), 20 Ohio N.P. (N.S.) 545.
 {¶ 84} During the trial below, the trial court questioned appellant about several matters to which he had testified. First, the court asked appellant if he ever filed a motion in either this case or the previous case, to enforce the temporary visitation order. This was in response to appellant's assertion that
 {¶ 85} appellee had denied him visitation rights. Next, the court asked appellant if he had any proof that he was forced to resign from his job at Fluor Daniel. This was in light of appellant's testimony that he was forced to resign because he no longer was considered fit for duty. Finally, the court questioned appellant about his 1996 and 1997 federal income tax returns. On those returns appellant included in his deductible business expenses, the expenses of traveling to Toledo for court proceedings, including the money he expended on meals while in Toledo. He further deducted money expended for Grant's health insurance as an employee benefit. With regard to this deduction, the court stated: "I'm just trying to figure out — testing a little credibility here." Because appellant was reimbursed for some business expenses by Fluor Daniel, those issues were relevant to determining appellant's true annual income. Accordingly we fail to see how these questions demonstrated any bias on the part of the trial court. The tenth assignment of error is therefore not well-taken.
 {¶ 86} On consideration whereof, the court finds that substantial justice has not been done the party complaining. The judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, is affirmed in part and reversed in part. This case is remanded to the trial court for a redetermination of child support consistent with this decision. The parties are ordered to pay their own costs of this appeal.
JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Peter M. Handwork, J., James R. Sherck, J., and Mark L. Pietrykowski,P.J., CONCUR.
[1] Effective March 22, 2001, the child support guidelines are now found at R.C. Chapter 3119. The present case, however, being filed on September 11, 1997, falls under the previous statute.